UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION AT LEXINGTON**

HITACHI AUTOMOTIVE SYSTEMS )
AMERICAS, INC., )
    Plaintiff, ) Action No. 5:18-CV-438-JMH
v. )
) **MEMORANDUM OPINION & ORDER**
TI AUTOMOTIVE LIGONIER )
CORPORATION, )
    Defendant. )

\*\* \*\* \*\* \*\* \*\*

This matter is before the Court upon Plaintiff's Motion for a Preliminary Injunction. [DE 4]. Defendant responded, [DE 13], and Plaintiff replied. [DE 15]. The Court held a hearing on Plaintiff's Motion on July 26, 2018. [DE 17]. Upon review of the parties' filings and hearing from the parties at the preliminary injunction hearing, the Court **GRANTS** Plaintiff's motion.

    **I.  Background**

Plaintiff Hitachi Automotive Systems Americas, Inc. filed this breach of contract action on July 5 by way of a verified complaint. [DE 1]. Hitachi alleges that Defendant TI Automotive Ligonier Corporation has breached its contract with Hitachi by refusing to ship "damper cover assemblies" ("DCAs") that Hitachi

1

uses to manufacturer "high pressure pumps." Hitachi then sells the high-pressure pumps to General Motors, who uses the pumps in some of its vehicles. [DE 1, p. 4, ¶15]. Hitachi alleges that TI has refused to ship thousands of DCAs, which will result in shut down of production for Hitachi and General Motors. [*Id*. at pp. 3-6; DE 4, p. 1].

According to Hitachi, it entered into a requirements contract with Millennium Industries Corporation in October 2014. [DE 1, ¶9]. Under that agreement, Millennium would manufacture and supply Hitachi with all of its requirements for DCAs. [*Id*. at ¶10]. Defendant TI acquired Millennium in February 2016 thus assuming all rights and obligations under the contract. [*Id*. at ¶11]. Under the Hitachi Standard Purchase Order Terms and Conditions, time is of the essence for every purchase from TI. [*Id*. at ¶¶13-15]. Hitachi alleges that "if there is any delay or interruption in Defendant's shipments to Hitachi, then Hitachi's own manufacture and shipment of its High Pressure Pumps will be delayed or interrupted, which will, in turn, cause delay or interruption in GM's production lines." [*Id*. at ¶15].

The agreement calls for the price to be set in the Purchase Orders, and according to Hitachi, the parties agreed to a price of $3.4355 per DCA. [*Id*. at ¶16; DE 1-3, p. 5; DE 1-2]. The parties reached that price based on a Material Purchase Fluctuation Agreement that "provided for an adjustment in the price of DCAs on

2

a quarterly basis." [DE 1, ¶22]. Thus, after each quarter, the parties would revise the requirements contract reflecting a surcharge adjustment. [*Id.*]. The parties have not done so, however, in nearly a year—the last adjustment they agreed to occurred in the third quarter of 2017. [*Id.*].

But the parties have continued operating under that agreement. Then, Hitachi issued three purchase orders to TI in June 2018. [*Id.* at ¶¶24-26]. TI did not ship the DCAs that Hitachi requested. [*Id.*]. Instead, TI sent Hitachi a letter that it would be ending its agreement with Hitachi and would cease all production of DCAs under the agreement, effective November 1, 2018. [DE 1-5]. In the meantime, if Hitachi wanted its purchase orders filled, TI would supply them only at a price of $5.6155 per DCA, rather than $3.4355. [*Id.*]. Hitachi responded to with a demand letter on June 28, 2018. [DE 1-6]. In a July 3 letter, TI confirmed that it would not ship the DCAs to Hitachi unless Plaintiff agreed to the increased price. [DE 1-7].

Hitachi claims the DCAs are unique and "there is no substitute supplier." [DE 1, ¶17]. Hitachi alleges that if it does not receive shipment of the DCAs the production line for the High Pressure Pumps could shut down and, in turn, GM's production line could shut down shortly thereafter. [*Id.* at ¶35].

Hitachi filed its verified complaint alleging three counts: Count I: breach of contract; Count II: Declaratory Judgment; and

3

Count III: Specific Performance. [DE 1]. Plaintiff also filed a Motion for Temporary, Preliminary, and Permanent Injunctive Relief asking this Court to issue a temporary restraining order or preliminary injunction requiring TI to resume shipment of DCAs. [DE 4].

The Court issued a temporary restraining order on July 6, 2018 and set a preliminary injunction hearing for July 12. [DE 8]. Upon agreement of the parties, the Court moved the preliminary injunction hearing to July 26 where the Court heard from both parties. The parties fully briefed the preliminary injunction issue, and the Court heard from the parties at the hearing. [DE 13, 15, 17].

**II. Preliminary Injunction Standard**

When a party seeks a preliminary injunction under Rule 65, the Court must consider: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction. *See Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). These are "factors to be balanced, not prerequisites that must be met." *Tenke Corp.*, 511 F.3d at 542. For example, where a party makes "an extremely strong showing of irreparable harm" they are "not

4

required to make as strong a showing of a likelihood of success on the merits." *Stein v. Thomas*, 672 F. App'x 565, 569 (6th Cir. 2016).

Plaintiff "bears the burden of demonstrating his entitlement to a preliminary injunction." *Jackson v. Coyne*, NO. 3:17-CV-P174-TBR, 2017 WL 3528605, at *1 (W.D. Ky. Aug 16, 2017). A preliminary injunction is "an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

**III. Analysis**

**A. Likelihood of Success on the Merits**

A breach of contract occurs in Kentucky when Plaintiff shows (1) existence of a contract, (2) breach of the contract, and (3) damages flowing form the breach of contract. *Se Metor Louisville/Jefferson Cty. Gov't v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009). "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." KRS 355.2-204.

TI makes two principal arguments why Hitachi cannot demonstrate likelihood of success: (1) there is no enforceable contract, and (2) if there is a contract, Hitachi breached it first and cannot now sue TI. [DE 13].

5

### *(i)* *Enforceable contract*

TI argues "there is no long-term agreement between the parties." [DE 13, p. 4]. Instead, TI argues there was an *initial* Requirements Contract issued in October 2014, followed by new quarterly requirements contracts in which the parties negotiated new prices. Hitachi admits that the parties operate under a Material Purchase Fluctuation Agreement that "provided for an adjustment in the price of DCAs on a quarterly basis." [DE 1, ¶22]. The last quarterly adjustment occurred in the third quarter of 2017. [*Id.*]. TI argues that "each time Hitachi issued a new Requirements Contract," the new agreement "superseded all prior versions" and "was a mere 'offer' by Hitachi that TI was free to accept or reject." [DE 13, p. 5]. Because the parties have not issued a new agreement since quarter three of 2017, TI argues there is no enforceable contract in place. [DE 13, p. 6].

Hitachi disagrees. It argues that the agreement is a long-term 100% requirements contract that extends the "life of the original equipment manufacturer and original equipment service programs with Hitachi's customer, General Motors." [DE 15, p. 1]. Hitachi argues that the material surcharge fluctuation agreements merely meant that each quarter, a new formulaic adjustment to the base price for the DCAs became active. [DE 15, p. 2]. Hitachi argues that in the third quarter of 2017 TI began seeking increases in price *above* the material surcharge fluctuations that were agreed

6

to in the contract. [*Id.*]. Thus, the parties have been operating since July 10, 2017 under the last valid pricing submittal tendered by TI. [*Id.*]. That established a price of $3.43550 per DCA. [*Id.*].

Hitachi argues that the entire agreement for the manufacture and supply of DCAs includes (1) the Requirements Contract, (2) purchase orders, and (3) the Hitachi standard purchase order terms and conditions. [DE 1, ¶13; DE 15, p. 2 n.2]. The contract [DE 1-1] has a start date of October 1, 2014. The material surcharge fluctuations simply changed the price of the DCAs on a quarterly basis. The price fluctuations are *part* of the agreement, but do not constitute *new* agreements, according to Hitachi. Each additional agreement after the initial contract "is merely a memorialization of the price fluctuations that were contemplated by the parties at the outset of the Agreement." [DE 15, p. 3].

The Court finds TI's argument unpersuasive. A range of documents point to an agreement between the parties. Each quarter, the documents that reflected the material surcharge fluctuation referenced the same initial contract number, B015351, and states that the contract start date is October 1, 2014. The Terms and Conditions also state that the agreement is "for the length of the applicable OEM vehicle program production life." And TI itself continued to ship products, thus indicating its own belief that a contract existed.

There is also nothing in the record indicating that the parties were required to issue new price fluctuation agreements every three months. As a practical matter, the parties did this, and it worked well for some time. At the preliminary injunction hearing, Hitachi said it was happy to pay higher prices caused by fluctuations in the *surcharge*, but that TI attempted to change the *base price*. And that's when things went awry. Hitachi argues that it *has* put forward requirements agreements for subsequent quarters, but TI refuses unless the base price increases. [DE 1, ¶22]. So for the last year, the parties have been operating under the 2017 quarter-three agreement. TI has shipped products during that time with the 2017 quarter-three agreement in place. This indicates that this latest agreement remains in force; TI does not adequately explain why they believe it has expired. After all, each time there was a price fluctuation, the parties agreed that the new language was "binding on the parties for the life of the applicable OEM vehicle program." [DE 13-1, "Special Note"].

Given the record before the Court and the conduct of the parties, the Court finds that a contract likely exists between Hitachi and TI.

### (ii) Did Hitachi Breach First

"He who commits the first substantial breach of contract cannot maintain an action against the other contracting party for a subsequent failure on his part to perform." *Hall v. Rowe*, 439

8

S.W.3d 183, 184 (Ky. Ct. App. 2014). TI claims Hitachi breached first and thus cannot maintain this action.

*First*, TI claims Hitachi breached first by "failing to issue a quarterly Requirements Contract since Q3 2017." [DE 13, p. 6]. TI surmises that this is because Hitachi does not want to give TI the opportunity to reject a new offer. [*Id*.]. This fails for the reasons explained above. Hitachi claims it has made efforts for a requirements agreement. [DE 1, ¶22]. Even if they hadn't, that does not mean that the Q3 2017 document would not still govern the relationship, especially given TI's conduct over the last year—shipping products with that document governing the relationship.

*Second*, TI argues that Hitachi breached by "failing to provide good faith volume estimates and demanding TI supply a quantity of parts that is unreasonably disproportionate to stated estimates." [DE 13, p. 7]. In essence, TI argues Hitachi required a volume of DCAs that was much lower than estimates Hitachi provided to TI when TI issued price quotations. [DE 13, pp 7–8]. This implicates Kentucky's version of the Uniform Commercial Code: "A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that not quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded." KRS

355.2-306. "With just one exception, courts addressing this provision have concluded that it applies differently to increased and decreased requirements. '[T]he majority of authorities have construed U.C.C. §2-306(1) as permitting good faith reductions in requirements, as opposed to increases, even though the reductions may be highly disproportionate to stated estimates.'" *Wiseco, Inc. v. Johnson Controls, Inc.*, 155 F. App'x 815, 817 (6th Cir. 2005) (quoting *Godchaux-Henderson Sugar Co., Inc. v. Dr. Pepper-Pepsi Cola Bottling Co.*, No. 83-5730, 1985 WL 13561, at *6 (6th Cir. Aug. 29, 1985)).

"Good faith" places several constraints on a buyer. "The buyer may not purchase the good in question from another seller; the buyer may not 'merely have had second thoughts about the terms of the contract'; and the 'buyer assumes the risk of [small] change[s] in his circumstances." *Wiseco*, 155 F. App'x at 818 (quoting *Empire Gas Corporation v. American Bakeries Co.*, 840 F.2d 1333, 1340–41 (7th Cir.1988)). "At the same time, the buyer does not act in bad faith if it reduced its requirements for 'business reasons . . . independent of the terms of the contract or any other aspect of its relationship with the [seller].'" *Id.* (quoting *Empire Gas*, 840 F.2d at 1339). "The seller bears the burden of demonstrating bad faith." *Id.*

Here, TI has not shown bad faith on the part of Hitachi. Plaintiff admits its requirements are lower than the initial quote

it received from TI, but Hitachi claims that is because its customer, GM, has demanded less than expected. In short, Hitachi "varied its requirements for valid business reasons," which is not bad faith. *Id.* Thus, the Court at this time does not find it likely that Hitachi breached on this basis.

*Third*, TI argues that Hitachi unilaterally imposed new and costly conditions on TI's performance by demanding that TI meet new cleanliness specifications and demanding that TI clean Hitachi's dunnage. [DE 13, p. 9]. But Hitachi counters that the specifications were in place before TI ever took over the contracts from its predecessor, Millennium. Plus, Hitachi points out, there was no unilateral decision on its part—the parties worked to approval the final Supplier Request for Engineering Approval in January 2016. [DE 15, p. 11].

On these issues, TI's arguments fail. The Court is satisfied that a contract existed, and Hitachi has demonstrated a likelihood of success on the merits.

**B. Irreparable Harm**

"Irreparable harm is generally defined as harm that cannot be fully compensated by monetary damages." *Wilson v. Bd. Of Educ. Of Fayette Cty.*, 2015 WL 4397152 (E.D. Ky. July 16, 2015) (citing *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002)). This involves more than *possible* harm; the harm must be actual or imminent. *See Winter v. Nat'l Res. Def.*

*Council, Inc.*, 555 U.S. 7, 22 (2008). A loss of business goodwill with a buyer can constitute irreparable harm. *TRW, Inc. v. Indus. Ss. Assocs Inc.*, 47 F. Appp'x 400 (6th Cir. 2002).

The Court is satisfied that Hitachi would suffer irreparable harm. It is true that a "plaintiff's harm is not irreparable if it is fully compensable by money damages." Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc., 716 F.3d 952, 957 (6th Cir. 2013). But that does not foreclose a preliminary injunction here. Although money damages would help make Hitachi whole, money would not *fully* compensate Hitachi because business relationships and goodwill are at stake. If, for example, Hitachi cannot afford the higher price or would be forced to ask for higher prices from *its* buyers, then money damages could not repair its damaged relationships.

Consider too what would happen if no preliminary injunction issued. Hitachi would be forced to pay a much higher price or be unable to supply its buyers. In essence, Hitachi would be forced to pay prices it never agreed to; TI would be able to hold Hitachi hostage to extract more money. This would effectively grant *TI* a preliminary injunction—Hitachi would be forced to fork over cash and sue TI for the difference. And in that scenario TI would not have to put up any bond. Instead, the Court will require Hitachi to post bond, and require the parties to operate under a price they did agree to.

Because without injunctive relief Hitachi could suffer loss of business goodwill and relationships, the Court finds it would suffer irreparable harm.

**C. Whether issuance of the injunction would cause substantial harm to others; and whether the public interest would be served by the issuance of the injunction.**

The Court considers the final two factors together because the parties did not focus on these factors, and the Court finds nothing to support TI's position. If anything, the absence of an injunction would harm others—Hitachi's customers and their employees.

**IV. Conclusion**

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1) That Plaintiff's Motion for a Preliminary Injunction [DE 4] is **GRANTED**;

(2) that Defendant TI Automotive Ligonier Corporation is hereby **ORDERED** to continue shipment of the damper cover assemblies (DCAs);

(3) That **within 10 days of this order,** the parties **SHALL SCHEDULE** mediation with a mediator of their choice;

(4) That pursuant to Federal Rule of Civil Procedure 65(c), Plaintiff **SHALL** place a bond in the amount of $100,000 into the registry account of the Court.

This the 27th day of July, 2018.



Signed By:
*Joseph M. Hood* /s/
Senior U.S. District Judge